**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 12a0519n.06

**No. 11-1180**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED

*May 18, 2012*

LEONARD GREEN, Clerk

|  |  |  |
|---|---|---|
| ANGELA TODD, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| RBS CITIZENS, N.A., | ) | DISTRICT OF MICHIGAN |
| | ) | |
| Defendant-Appellee. | ) | |
| | ) | |
| | ) | |

**BEFORE: DAUGHTREY and ROGERS, Circuit Judges; ZOUHARY, District Court Judge.**[*]

**ROGERS, Circuit Judge.** In this employment discriminations case, plaintiff Angela Todd claims she was terminated by defendant Citizens Bank because of race. During the relevant period, Todd managed two branches of the bank, which were subject to quarterly risk assessments. Todd's branches failed three out of four risk assessments, after which she was fired. Todd filed suit, alleging race discrimination in violation of Title VII of the Civil Rights Act of 1964 and the Elliot-Larsen Civil Rights Act. The district court granted summary judgment to Citizens Bank because Todd failed to prove her prima facie case and, alternatively, could not show pretext. Because Todd could not establish that Citizens Bank's explanation for her termination was pretext for discrimination, summary judgment was warranted.

---

[*] The Honorable Jack Zouhary, United States District Judge for the Northern District of Ohio, sitting by designation.

On July 14, 2000, Todd, who is African American, was hired as an in-store sales manager by Charter One Bank, which was acquired by Citizens Bank in 2004. R. 32-3, ¶ 3; R. 32-2, Todd Dep. at 26-27. Todd soon became a branch manager, in which capacity she was charged with running a bank branch and responsible for "meeting her sales goals, supervising her colleagues, and maintaining operational compliance at her branch." R. 32-4, Fisher Aff. at ¶ 4. Todd was responsible for the security of the bank's assets, and was required to perform spot checks designed to ensure that her subordinates followed proper financial protocol. R. 32-2, Todd Dep. at 132. Citizens Bank's Retail Colleague Commitment Guidelines emphasized that branch managers are "ultimately responsible for the operation of their branch(es)." R. 32-8 at 3.

In January 2005, Todd was transferred to manage the Grosse Point branch of Citizens Bank, and shortly thereafter was elevated to officer status. R. 32-2, Todd Dep. at 132. The Bank did not confer officer status on all branch managers, and Todd testified that the status meant that she had a more direct fiduciary duty to protect the assets of the bank. *Id.* at 82.

In 2007, Citizens Bank implemented a new process called "risk assessments," designed to test a branch's ability to pass a corporate audit. *Id.* at 54, 393. The new risk assessment process standardized how to measure the operational compliance of the various, newly-acquired branches. R. 32-6, Jordan Dep. at 15-16. The operations department, headed by Laura Jordan, conducted the risk assessments on a quarterly basis. *Id.* at 18. Operations managers, who reported to Jordan, would answer a series of standardized questions during multiple, surprise visits to each branch. *Id.* at 14, 21, 23; R. 32-7, Grosse Pointe Risk Assessments. The questions tested each branch in the areas of cash handling, compliance, security, and business account openings. R. 32-7. Based on the

operation manager's evaluation, each branch received a computerized score represented as a percentage. R. 32-6, Jordan Dep. at 17. This score determined whether a branch was rated green, yellow, or red. Citizens Bank expected all branches to be rated green. Regional managers had no involvement in the ratings. R. 32-2, Todd Dep. at 138.

As part of this new process, Citizens Bank adopted a policy that disciplined branch managers for failing a rating. R. 32-9, at 2-7. Under this policy, a branch manager who received a red risk rating was placed on a Performance Development Plan ("PDP"). *Id.* at 5-6. If the circumstances warranted stronger action, the regional manager had the discretion to issue PDP's for the entire branch's management team. *Id.* If there was no improvement in performance, the regional manager could put a "Final Written Warning" in place for the "members of the management team that were determined as responsible for the initial Red Risk Assessment/Audit." *Id.* A subsequent failure to improve performance would result in termination.

In the second quarter of 2008, while the Grosse Pointe branch was managed by Todd, the branch failed a risk assessment, scoring 53.64% and receiving a red rating. R. 32-7 at 2-6. At that time, Todd reported to regional manager Michael Cullen. R. 32-2, Todd Dep. at 94. Todd testified that the branch was poorly managed and deserved the red rating: "the branch was just sloppy. . . . [and] whatever we received, the performance development plan, we deserved." *Id.* at 235.

As a result of the failed risk assessment, and pursuant to Citizen Bank's discipline policy, Cullen placed Todd on a PDP. *See* R. 32-11, PDP at 2-5. The PDP warned Todd that "if you do not demonstrate immediate and sustained improvement or if other deficiencies arise, management will continue the Performance Management Improvement Process, which may result in further corrective

action up to and including termination." *Id.* at 2. In making the decision to place Todd on the PDP, Cullen did not attempt to differentiate the mistakes Todd personally made from those of her subordinates. R. 38-4, Cullen Dep. at 48. Instead, Cullen determined that Todd had overall responsibility for the branch and issued the PDP on that basis. *Id.* As part of the PDP, Cullen conducted initial meetings with Todd to discuss the PDP. Cullen also agreed to have further meetings with Todd, but could not recall if those occurred on a weekly basis. *Id.* at 64-65.

Following the second quarter rating, an operations manager supporting the region partnered with the Grosse Pointe branch. This manager, Allison Gabler, gave Todd's branch significant attention beyond what other branches in the region received. R. 32-10, Gabler Dep. at 77, 81. In addition, Laura Jordan, the Operations Director, held a meeting with the entire Grosse Pointe branch staff to impress upon them the gravity of the situation. R. 32-6, Jordan Dep. at 30-31. Gabler testified that, in her five years as operations manager, she had attended only one other meeting of this nature. R. 32-10, Gabler Dep. at 54.

Notwithstanding this increased attention, the Grosse Pointe branch scored 57.00% and received another red rating in the third quarter of 2008. R. 32-7 at 7-19. The assessment was based on surprise visits that occurred on July 11, August 22, and September 15, 2008. *Id.* at 7. Many of the errors were attributable to Todd's subordinates; however, Todd personally made some non-supervisory errors that contributed to the negative assessment. For example, during one surprise visit, Todd did not know her signature authority limits, alarm code, or password. R. 32-2, Todd Dep. at 353-355. Further, Todd testified that she understood that verification of business accounts was important to prevent money laundering, yet failed to open and verify business accounts properly.

4

R. 32-7 at 2, 23. At least some of the errors were attributable to actions taken by the assistant manager, who was in control of the branch during Todd's 10-day vacation, from which she returned on September 15.

Todd asserts that two of her subordinates—Natalie Davis (assistant manager) and Kathleen Williamson (teller manager), who are both white—were primarily responsible for the branch's failure to pass the risk assessments. Assistant Manager Davis had left $10,000 sitting in the ATM machine over the weekend, and Teller Manager Williamson had stopped performing audits on the cash drawers of the tellers. R. 38-34, Todd Aff. ¶7. Further, Davis had committed a violation of bank security procedures by calling the vault custodian at home, requesting the vault's password, and entering the vault alone. *Id.* Although Davis and Williamson were punished for actions taken in the second quarter—both were placed on a PDP, R. 38-30 (Davis PDP, June 18, 2008); R. 38-32 (Williamson PDP, July 1, 2008)—neither was punished for her third quarter actions.

Consistent with the recommended corrective action for a branch manager whose branch had received two consecutive red ratings, R. 38-27 at 2, Todd was issued a Final Written Warning on September 25, 2008. The Warning stated:

> If after successfully completing this Final Written Warning, you revert to a performance level or behavior which warranted the FWW or if other deficiencies arise, you may be subject to further disciplinary action, up to and including termination, without repeating the steps in the performance management process.

R. 32-11, at 5. After the third-quarter risk assessment, Gabler worked with Todd to improve operations. With this additional assistance, the Grosse Pointe branch received a green rating for the fourth quarter of 2008. R. 32-7 at 20-32.

5

On January 3, 2009, Todd was transferred to the 696/Hoover branch. The new branch had a smaller deposit base and was located in a region managed by Cathy Fisher, the regional manager who had originally hired Todd. R. 32-4, Fisher Aff. at ¶3. It is disputed whether the transfer was punishment for the red ratings, but Todd testified that she viewed the transfer as a "fresh start." R. 32-2, Todd Dep. at 146. Upon arriving at the 696/Hoover branch, Todd testified that she took steps to ensure that the branch was risk compliant. *Id.* at 296-97. This included meetings with the outgoing branch manager, a review of the branch's prior risk assessment, and a pre-risk assessment performed by the operations manager. *Id.* at 284, 296-97. It is disputed whether the operations manager provided all of the support Todd requested.

The 696/Hoover branch had received a green rating for the fourth quarter of 2008. R. 32-4, Fisher Aff. at ¶6. Under Todd's supervision, the 696/Hoover branch received a red rating for the first quarter of 2009, with a score of 57.5%, although Shawn Boyd was listed as the branch manager. R. 32-14, 696 Assessment, at 2-16. The assessment covered six days that pre-dated Todd's arrival at the branch on January 6, 2009, and ran through the end of February 2009. Of the errors noted on the assessment, a handful occurred before Todd arrived. *Id.* However, the visit dates for the risk assessment—February 18 and 19, 2009—occurred over a month after Todd's arrival. *Id.* at 2.

After the 696/Hoover branch received the failed risk assessment, Fisher recommended that Citizens Bank terminate Todd. R. 32-4, Fisher Aff. at ¶ 7. In making this determination, Fisher contacted Cullen regarding Todd's prior disciplinary record, reviewed Todd's prior warnings, and determined that termination was necessary. *Id.*; R. 32-15, Termination email at 1. Regarding her contact with Cullen, Fisher testified that she "was told that [Todd] made improvements in the fourth

quarter of her assessment." R. 39-1, Fisher Dep. at 56. Although Todd had only been branch manager of the 696/Hoover branch for 45 days, Fisher believed Todd should be held responsible:

> Having went through the red process I know the support that a manager is given to help correct that, and all I look for is improvement, and when the same mistake continues to be repeated time and time again and it's put through the performance management process and HR has also recognized the issue, it wasn't an issue that started in the forty-five days that she was there. It was an issue that had continued previously in her personal performance. She was not knew [sic] to the bank.

*Id.* at 66-67. Todd does not contend that Fisher acted on a racially discriminatory basis. R. 32-2, Todd Dep. at 93, 305. Fisher forwarded her recommendation to Karen Minghine, the Retail Director. R. 32-15, Termination Email at 2-4. Fisher also forwarded the recommendation to Adriana Seaton, a human resource manager, and Jordan, the operations manager. *Id.*

Finally, Fisher contacted Tracey Moore, an employee relations specialist. *Id.* Moore was unaware of the fact that a branch managed by Todd had received a green rating in the fourth quarter of 2008. R. 38-26, Moore Dep. at 46. Moore testified that she did not know if the intervening green rating would have changed her recommendation. *Id.* According to Moore, Todd's three red ratings placed her at the bottom of the disciplinary chart, with a recommendation for termination. *Id.* Moore also testified that even if a manager had a red-green-red rating history—which Todd did not—termination might be an option depending on the past disciplinary history. *Id.* at 51-52. Moore did review the terms of the Final Written Warning and the most recent red rating. *Id.* at 38-40. She stated that she supported Fisher's recommendation because Todd had received three red ratings, and human resources guidelines indicated that termination was appropriate following a PDP and a Final Written Warning.

7

Although Fisher initiated Todd's termination, Todd claims that the only person who discriminated against her based on race was Mike Cullen, her regional manager at the Grosse Pointe branch. R. 32-2, at 93. Between 2008 and 2009, four African American female branch managers reported to Cullen. R. 32-3 at ¶7. Aside from Grosse Pointe, none of the branches managed by African Americans failed the risk assessments. In 2008, only two of the thirteen branches in Cullen's region failed a risk assessment: Todd's branch and a branch managed by Katherine Williamson, a white female, who is no relation to Kathleen Williamson, the teller manager in Grosse Pointe. *Id.* at ¶ 6. When Williamson's branch received a red rating, Cullen issued her a PDP. *Id.* Unlike Todd, however, Williamson's branch subsequently received only green ratings. *Id.*

The treatment of branch managers in Fisher's region—the region Todd was located in when terminated—was consistent across racial lines. During 2008-09, Fisher supervised four African American branch managers. R. 32-4, Fisher Aff at ¶5. Todd was the only African American branch manager in the region to receive a red rating. *Id.* at ¶9. In 2008, a branch managed by Erin Henry, a white female branch manager, received a red rating. *Id.* at ¶10. Henry was stripped of her branch-manager title, and made an assistant manager. *Id.*

Another branch manager failed her risk assessment in the second quarter of 2008: Patricia Cassar. Cassar was located in a different region and reported to a different regional manager. R. 38-36, Cassar Warning at 1. When the branch managed by Cassar received a red rating in the second quarter of 2008, she received a verbal warning instead of being placed on a formal PDP. *Id.*

Following Todd's termination, she filed the instant complaint in state court, and Citizens Bank removed the action to federal district court. The district court granted Citizens Bank's motion

for summary judgment, finding that Todd had not shown that she was treated differently than similarly situated employees, *id.* at 5, because she failed to identify any other branch managers whose branch had similarly failed three risk assessments. *Id.* The district court determined that Todd's two subordinates were not comparators because the subordinates reported to a different supervisor, had different job duties, and had different performance expectations. *Id.* The district court also acknowledged that Citizens Bank had proffered a nondiscriminatory reason for Todd's discharge: her branches' failures of three risk assessments. *Id.* at 6.

Turning to pretext, the district court held that there was not a fact issue regarding Todd's unsatisfactory job performance. *Id.* at 6-7. Further, Todd could not prove that Cullen, the only individual that she alleged acted with racial animus towards her, in any way instigated her termination or was motivated by discrimination. Todd had been fired by a different regional manager, *id.* at 6-7, and it was Allison Gabler, not Cullen, who had issued the red risk assessments in her capacity as operations manager. *Id.* at 7. Though the district court indicated that "there may have been an error" in the termination process followed by Citizens Bank, the district court granted summary judgment in favor of Citizens Bank because there was "no causal connection between the error if it occurred and racial animus." *Id.* Todd appeals.

Todd has not identified a genuine issue of material fact sufficient to support a claim of race discrimination against Citizens Bank under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and the Elliot-Larsen Civil Rights Act ("ECLRA"), M.C.L. § 37.2101, *et. seq.* Claims alleging race discrimination under the ECLRA are "analyzed under the same evidentiary framework" as Title VII claims, *In re Rodriguez*, 487 F.3d 1001, 1007 (6th Cir. 2007), which in this case means

the familiar burden-shifting framework articulated in *McDonald Douglas Corp. v. Green*, 411 U.S. 792 (1973).

The district court held that there was no genuine issue of material fact both (1) that Todd had not made out a prima facie case of race discrimination and (2) that Todd could not show pretext. It is sufficient to affirm the judgment in this case that the district court's decision was correct as to the second ground.

Under *McDonnell Douglas*, assuming the plaintiff establishes a prima facie case, an employer may provide a legitimate alternative reason for the discharge, which shifts the burden back to the plaintiff to show that the proffered reason was only a pretext. *Spengler v. Worthington Cylinders*, 615 F.3d 481, 492 (6th Cir. 2010). Because Todd cannot rebut Citizen Bank's proffered legitimate, non-discriminatory reason for her termination, she cannot prevail on her race discrimination claim.

Citizens Bank has proffered a legitimate, non-discriminatory reason for discharging Todd: her deficient performance as a branch manager. Citizens Bank asserts that it terminated Todd for poor job performance, noting that branches managed by Todd received three red risk assessments in four quarters, the final one occurring after Todd received a Final Written Warning. Poor job performance is of course a legitimate rationale for adverse employment actions.

In response, Todd has failed to raise a genuine issue of material fact showing Citizen Bank's explanation was pretextual. "A plaintiff can refute the legitimate, nondiscriminatory reason articulated by an employer to justify an adverse employment action 'by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct.'" *See Johnson v. Kroger Co.*, 319 F.3d 858,

10

866 (6th Cir. 2003) (quoting *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000).

"Regardless of which option is used, the plaintiff retains the ultimate burden of producing 'sufficient evidence from which the jury could reasonably reject [the defendants'] explanation and infer that the defendants intentionally discriminated against [her].'" *Johnson*, 319 F.3d at 866 (quoting *Braithwaite v. Timken Co.*, 258 F.3d 488, 493 (6th Cir.2001)). Todd did not meet her burden under any of the options, and thus is ultimately unable to refute Citizen Bank's legitimate, non-discriminatory reason for her termination.

Todd does not dispute that the branches she managed failed three out of four risk assessments; rather, she claims that Citizens Bank did not follow its own procedures in terminating her, and that this is evidence of pretext. However, Todd's argument fails as Citizens Bank followed the correct procedure, terminating Todd when she reverted to a red risk assessment after receiving her Final Written Warning. The record evidence demonstrates that this was the authorized procedure for the termination of branch managers. The Final Written Warning states that termination could occur if performance reverts to unacceptable levels, even if the employee had successfully improved performance. Todd's argument, therefore, that she had successfully completed the Final Written Warning is immaterial. Fisher testified that once she learned that the 696/Hoover branch had received a red risk assessment, she compared the conditions of Todd's Final Written Warning against the violations in the risk assessment. R. 38-6, Todd Dep. at 24. Based on this comparison, Fisher recommended termination. *Id.* This testimony is buttressed by an e-mail sent by Fisher to Laura Jordan, in which Fisher wrote, "I am requesting . . . that Angela Todd is terminated based on her

11

recent Red Risk Assessment and not meeting the requirements of her Final Warning." R. 32-15, Termination e-mail at 1.

Todd contends that a branch manager could only be terminated if she received three consecutive red risk assessments, but Citizen Bank's internal procedures have not been shown to require this. In support of this proposition, Todd cites a chart sent to regional managers, which suggests actions to take against branch managers who received a failed risk assessment. R.38-27, Discipline Chart at 2. Todd reads the chart to imply that a branch manager could only be terminated following three consecutive quarters of red risk assessments, but the chart cannot be reasonably read in this manner. The chart recommends actions based on three quarters of performance, *id.*; it does not contemplate Todd's situation, which involved four quarters of performance that included red-red-green-red ratings. *Id.* Todd argues that her last three quarters of performance earned a red-green-red rating, which would not warrant termination according to the chart. However, in assessing the three quarters of performance, the chart assumes that the manager started the first quarter with a clean disciplinary record and was not already on a PDP or Final Written Warning. R.38-26, Moore Dep. at 51. Todd's red-green-red performance cannot be viewed without consideration of her prior disciplinary history. Further, Todd has not provided evidence that regional mangers were required to limit their review of a branch manager's performance to only three quarters and ignore prior discipline.

It also does not appear, as Todd contends, that Citizens Bank terminated Todd based on a mistaken belief that she had three consecutive red risk assessments. According to her deposition, Tracey Moore, an employee relations specialist that reviewed Todd's file, based her termination

recommendation on the fact that Todd had three red risk assessments. R. 38-26, Moore Dep. at 46-47. Moore also testified that she reviewed the terms of the Final Written Warning and the most recent red risk assessment. *Id.* at 38-40, 55. Although unclear, viewing the evidence in the light most favorable to Todd, it appears Moore made the assumption that Todd had three *consecutive* red risk assessments. As evidence of this, Moore testified that she was unaware that Todd had received a green risk assessment for the fourth quarter 2008, R. 38-26, Moore Dep. at 46. Moreover, in an e-mail written by Tracey Moore to Cathy Fisher, Moore lists Todd's disciplinary history but omits a reference to the Grosse Pointe branch's fourth quarter 2008 green risk assessment. R. 38-22. However, in order for Todd to be terminated, the operations director had to approve the termination. The operations director, Laura Jordan, sent an e-mail indicating that Todd's prior improvement at Grosse Pointe had been considered as part of the process. Jordan wrote: "Having been involved with Angela's performance improvement with her previous Regional Manager and after reviewing these recent findings at her new branch I concur with Karen and Cathy's recommendation [of termination]." R. 32-15, Termination e-mail at 1. This demonstrates that, even if Moore did not consider the green assessment, the management at Citizens Bank did.

Ultimately, it does not matter if Citizens Bank fired Todd based on a mistaken belief that she had received three red risk assessments. Under the "honest belief" rule, "as long as an employer has an honest belief in its proffered nondiscriminatory reason for discharging an employee, the employee cannot establish that the reason was pretextual simply because it is ultimately shown to be incorrect." *See Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001). Todd has not shown that the e-mail sent by Moore was anything other than an honest omission of the green

13

rating for the fourth quarter 2008, and more importantly, Fisher did not correct Moore's purportedly inaccurate list of Todd's disciplinary history. R. 38-22, Termination e-mail. As Todd admits that Fisher had no discriminatory animus, and Fisher is the one that failed to correct the record, Todd cannot claim now that any alleged mistake was infected by discriminatory animus.

In the alternative, Todd contends that Cullen, her former regional manager, concocted an elaborate conspiracy motivated by racial animus that was the true impetus behind her termination. First, Todd argues that Cullen wrongly placed her on the PDP and the Final Written Warning, while preventing Todd from disciplining branch employees. With regard to the PDP, issued to Todd for the first red risk assessment, she admitted that "the branch was just sloppy in all of this. So whatever we received, the performance development plan, we deserved that for that particular—for this first risk assessment." R. 32-2, Todd Dep. at 235. In addition, as a result of this first red risk assessment, Todd placed Assistant Manager Davis on a PDP, R. 38-30, and Cullen placed Teller Manager Williamson on a PDP. R. 38-32. These facts undermine Todd's theory, as Cullen properly placed Todd on a PDP following the first red risk assessment and also allowed Todd to punish her subordinates.

Second, Todd contends that Cullen should have further punished Assistant Manager Davis and Teller Manager Williamson following the second red risk assessment. This argument implies that Cullen's failure to punish Davis and Williamson after the second red risk assessment somehow affected Todd, but this is illogical. As the supervisor "ultimately responsible for the operation of [her] branch[ ]," R. 32-8 at 3, it was reasonable that Todd receive a Final Written Warning for the second red risk assessment, independent of any punishment received or not received by Davis or

Williamson. In addition, after the second red risk assessment, the Grosse Pointe Branch received a green risk assessment and Todd was subsequently transferred. Not punishing Davis and Williamson for their third quarter work, therefore, had no impact on Todd and could not have led to her termination.

Third, Todd admits that Cullen had no official role in her termination, but claims that he infected the process. In making this argument, she relies on two pieces of evidence. First, Cullen spoke to Fisher following Todd's transfer to the 696/Hoover branch. Todd claims that Cullen incorrectly told Fisher that Todd was "on" a Final Written Warning. In contrast, Fisher testified that Cullen told her that Todd had "made improvements in the fourth quarter of her assessment." R. 39-1, Fisher Dep. at 56. Even if Cullen told Fisher that Todd was still on a Final Written Warning, Fisher testified that she reviewed the Warning, which on its face indicates it was issued on September 25, 2008 and ran for thirty days. R. 32-11 at 4-5. Because Fisher read the Final Written Warning and knew its terms, any erroneous information regarding the warning could have no effect. Second, Todd claims that Cullen did not correct Moore's failure to include the green risk assessment in her evaluation of Todd. The only evidence of this is an e-mail, forwarded by Fisher to Cullen, in which Fisher asked Cullen for a copy of the Final Written Warning. R. 38-22. The e-mail that Fisher forwarded was a request by Moore to Fisher to confirm that she had correctly documented Fisher's disciplinary history. Moore did not ask Cullen about Todd's performance, and Fisher did not ask Cullen to review the information contained in Moore's e-mail. No reasonable jury would find that this purported failure to correct was motivated by racial animus or the true reason for Todd's termination.

15

Todd also claims that a series of seemingly unrelated incidents demonstrate pretext, but each of these arguments is unconvincing. First, Todd complains that Karen Minghine, the Retail Director, had belittled Todd's request for a 200% sales goal, and had insisted that Todd accept a lower goal. R. 38-34, Todd Aff ¶12. Todd reached the 200% sales goal, but complains that "Minghine never acknowledge[d] my accomplishment." *Id.* Aside from this lack of appreciation, Todd does not explain how this action reflects disparate treatment. For example, Todd does not explain whether her goal was in line with that of other managers, how the sales goals had any impact on her job, or whether Minghine treated a non-member of a protected class differently. Second, Todd complains that Minghine awarded a trip based on sales performance to Todd's Assistant Manager, instead of Todd. *Id.* at ¶13. Todd provides no connection between the award of the trip and her termination. Third, Todd complains that Minghine called her directly to berate her about teller wait times instead of working through the regional manager. *Id.* at ¶ 14. Todd does not explain how this phone call demonstrates that the reason given for her termination was pretext for discrimination. If anything, it shows that a branch managed by Todd had performance issues that warranted a call from the Retail Director. Finally, and most importantly, all of these perceived slights occurred in 2004, four years before Todd's termination. R. 32-2 at 83; R. 32-3 at ¶3. Such a length of time is too tenuous to establish discrimination in this case.

Because Todd did not raise a genuine issue of material fact and cannot rebut Citizen Bank's claim that Todd was fired for her deficient performance and management, the district court correctly granted Citizen Bank's summary judgment motion on Todd's race discrimination claim.

Finally, Todd complains that the district court abused its discretion by failing to require Citizens Bank to produce e-mail messages sent during 2008, raising many of the same arguments she made below. Faced with these arguments, the district court found that Citizens Bank had made a thorough and reasonable email search. R. 36, Order Overruling Pl's Objections. The district court reasoned "Plaintiff's mere disappointment with the results of Defendant's thorough and reasonable e-mail search cannot support her accusation that Defendant is holding back responsive emails." *Id.* at 5-6. Todd has not raised any novel arguments to this court, and there is nothing to suggest that the district court abused its discretion in rejecting plaintiff's objections to the Magistrate Judge's report regarding Todd's second motion to compel.

For the foregoing reasons, we affirm the judgment of the district court.